**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Francisco MORENO, Defendant–Appellant.**

**No. 01–5321.**

United States Court of Appeals, Sixth Circuit.

July 26, 2002.

Before KRUPANSKY and COLE, Circuit Judges, and DUGGAN, District Judge.[*]

KRUPANSKY, Circuit Judge.

The defendant-appellant Francisco Moreno ("Moreno" or "the defendant"), a Mexican citizen, has contested his conviction under 28 U.S.C. § 841(a)(1) imposed pursuant to his conditional plea of guilty to possessing approximately fifteen kilograms of cocaine with intent to distribute, arguing that the district court erroneously denied his motion to suppress the narcotics evidence against him, all of which had been seized from inside his vehicle following a traffic stop. The defendant has contended that the arresting officer had illegally stopped his vehicle.

On the afternoon of March 9, 2000, Memphis Police Detective Brady Valentine ("Valentine") was operating a stationary radar device from inside his patrol car while it was parked on the median strip of Interstate Highway 240 within the Memphis, Tennessee municipal boundaries. Around 12:30 p.m., Valentine observed a maroon Chrysler Town and Country minivan which had "darkened" or "tinted" side windows. Both a Tennessee statute (Tenn.Code Ann. § 55–9–107) and a Memphis ordinance (Section 21–338) criminalized the operation of some motor carriages having colorized or "tinted" windows. However, as developed below, the two enactments have dissimilar elements. Valentine stopped the Chrysler minivan to enable his further investigation of a suspected "window tint" violation. A video camera mounted inside Valentine's squad cruiser recorded the traffic stop.

The officer observed North Carolina license plates affixed to the target vehicle, and two persons seated therein, as he approached its passenger side. The passenger (and van's owner), defendant Moreno, lowered its right front window. Through that portal, Valentine requested the driver's motor vehicle operator's permit, and informed both Moreno and the driver Paul Ramirez ("Ramirez") that he had stopped

---

[*] The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

their motorcar because he suspected that its darkened side windows violated Tennessee standards. However, at that juncture, the constable's focus shifted immediately from the investigation of a possible window tint infraction to suspected narcotics trafficking, because he instantly detected a pungent familiar "acidic" scent emanating from inside the van's passenger compartment which he associated with past cocaine trafficking arrests. Additional "plain view" indicia of probable narcotics transporting, including the presence of four or five odor-masking coconut air fresheners, two vehicle security devices (namely a "club" steering wheel lock and an after-market alarm), various tools, and the passenger's evident nervousness, prompted Valentine to request permission to search the automobile.

Both occupants verbally authorized a vehicular search.[1] Ultimately, the peace officer discovered a clandestine metal compartment welded onto the minivan's undercarriage. After prying it open with a screwdriver found inside the passenger carriage, Valentine located fifteen one-kilogram bricks of cocaine concealed within. Following the arrests of Moreno and his traveling companion, the detective field-tested the tinting on the minivan's side windows by using a state-issued "comparison card." He concluded that those windows were darker than permitted by Tennessee law.

Following a March 15, 2000 two-count federal indictment which charged the defendant with conspiracy to possess approximately fifteen kilograms of cocaine with intent to distribute (count one) and possession of approximately fifteen kilograms cocaine with intent to distribute (count two),

Moreno moved to suppress the cocaine evidence seized from the Chrysler minivan, arguing *inter alia* that the initial traffic stop was illegal because (1) the vehicle's windows did not offend the Tennessee window tinting statute, and (2) the Memphis window tinting ordinance was either void under the United States Constitution or pre-empted by inconsistent state law. On August 21, 2000, a magistrate judge issued a Report and Recommendation which advised denial of the defense's suppression motion. Following objections by both the defendant and the government, the district court, on September 28, 2000, rejected the defendant's objections, sustained the government's objections, and adopted the Report and Recommendation with the sole exception of a single footnote opposed by the U.S. Attorney which is not germane to the subject appeal.

On October 5, 2000, Moreno and the United States executed a plea agreement whereby, among other things, the defendant pledged to plead guilty to count two of the indictment, and the prosecution promised to dismiss count one. On October 11, 2000, with the trial court's approval, the defendant and the government agreed, in writing, to preserve Moreno's right to challenge the lower court's adverse resolution of his suppression motion. On February 26, 2001, the trial judge journalized judgment against Moreno on count two, and sentenced him to seventy months in a federal penitentiary, to be followed by three years of supervised release should the government fail to deport him upon the conclusion of his imprisonment. On March 1, 2001, Moreno initiated a timely appeal to this court.

---

1. On review, the defendant has not assailed his and his cohort Ramirez's voluntary approval of the search, nor has he faulted the conduct of Valentine's narcotics investigation *per se. See generally United States v. Drayton,* —— U.S. ——, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002).

A trial court's denial of evidence suppression is fundamentally a legal ruling examined *de novo*, although affiliated findings of historical fact are reviewed for clear error in the light most favorable to the government.[2] *United States v. Duncan*, 918 F.2d 647, 650 (6th Cir.1990). On review, Moreno has asserted that the district judge should have suppressed the cocaine located inside his vehicle because the predicate traffic stop was allegedly "unreasonable" under the Fourth Amendment,[3] which averredly contaminated that evidence as excludable "fruit of the poisonous tree." *Wong Sun v. United States,*

371 U.S. 471, 484–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Absent a warrant, a law enforcement operative may lawfully stop a moving vehicle in at least two circumstances: (1) when he or she has "probable cause"[4] to conclude that a vehicular infraction or other criminal violation involving the automobile or its occupants has occurred or is occurring, *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); and/or (2) when he or she has "a reasonable, articulable suspicion that criminal activity is afoot"[5] involving the vehicle,

2. Generally, evidentiary rulings should be scrutinized for "abuse of discretion." *See General Electric Co. v. Joiner,* 522 U.S. 136, 142–43, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *United States v. Mack,* 258 F.3d 548, 553 (6th Cir.2001). On "abuse of discretion" review, legal issues are examined *de novo,* whereas factual findings are tested for clear error. *See Romstadt v. Allstate Ins. Co.,* 59 F.3d 608, 615 (6th Cir.1995) (explaining that an abuse of discretion occurs "when the reviewing court is firmly convinced that a mistake has been made. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses [an] erroneous legal standard.") (brackets added; quotation marks and citations omitted).

3. The Fourth Amendment posits, in relevant part, that "[t]he right of the people to be secure in their persons ... and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV.

The "touchstone of the Fourth Amendment is reasonableness." *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (citation omitted). The "reasonableness" determination hinges upon objective factors, not the actual subjective motivation of the officer involved. *Whren v. United States, 517 U.S. 806, 811–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).*

4. " 'Probable cause' denotes 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believ-

ing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir.1988) (*quoting Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979))." *Painter v. Robertson,* 185 F.3d 557, 569 (6th Cir.1999). "Probable cause is defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir.1993) (*en banc*) (citation omitted). This standard requires proof of "only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates,* 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). An assessment of probable cause should consider the totality of the circumstances. *Id.* "This totality of the circumstances analysis includes a realistic assessment of the situation from a law enforcement officer's perspective." *Ferguson,* 8 F.3d at 392. *See also United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

5. "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity." *Illinois v. Wardlow,* 528 U.S. 119, 123–24, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citations omitted).

which, standing alone, warrants a brief "investigative detention,"[6] *Illinois v. Wardlow,* 528 U.S. 119, 123–26, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (*citing, inter alia, Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The existence of "probable cause" or "reasonable suspicion" on a particular set of facts poses a *de novo* legal issue. *United States v. Arvizu,* 534 U.S. 266, 122 S.Ct. 744, 751, 151 L.Ed.2d 740 (2002); *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Martin,* 289 F.3d 392, 396 (6th Cir.2002).

■ Initially, Moreno has contended that Detective Valentine lacked the requisite "probable cause" or "reasonable suspicion" to justify the stop of the minivan for *any* length of time. At the inception of the subject traffic stop, the officer informed Moreno and Ramirez that he suspected that their vehicle's windows violated the Tennessee state statute controlling window tinting. That enactment posits:

> It is unlawful for any person to operate, upon a public highway, street or road, any motor vehicle registered in this state, in which any window, which has a visible light transmittance equal to, but not less than, that specified in the Federal Motor Vehicle Safety Standard No. 205, has been altered, treated, or replaced by the affixing, application or installation of any material which:

> (A) Has a visible light transmittance of less than thirty-five percent (35%); or

> (B) With the exception of the manufacturer's standard installed shade band, reduces the visible light transmittance in the windshield below seventy percent (70%).

Tenn.Code Ann. § 55–9–107(a)(1).

The defendant has asserted that the patrolman knew or should have known, prior to his initial contact with the occupants of the Chrysler, that section 55–9–107(a)(1) did not proscribe the operation of Moreno's minivan in Tennessee irrespective of its darkened windows, allegedly for at least three reasons: (1) the vehicle displayed North Carolina license plates, whereas section 55–9–107(a)(1) reached only motorcars registered in Tennessee; (2) the Tennessee statute averredly implicated only "after-market" tinting, whereas the van's windows allegedly lacked any label(s) identifying an "after-market" tint application;[7] and (3) the Tennessee law bans the operation of vehicles having side windows darkened to a degree which permits less than 35% of visible light to penetrate into the vehicle's passenger compartment (or, stated differently, which reflects more than 65% of visible light), whereas the minivan's windows allegedly were obviously not darkened to that comparatively extreme degree.[8]

---

**6.** "The scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

**7.** The Joint Appendix contained no proof in support of the defendant's sweeping assertion that "after-market" window tinting is universally accompanied by identifying decals; nor did it reflect any evidence relevant to the actual origin of the window tinting on Moreno's van.

Because this reviewing court's ultimate resolution of this appeal, as developed herein, does not require it to define the full scope of Tenn.Code Ann. § 55–9–107(a)(1), it expresses no opinion as to whether or not the Tennessee statute may exclusively be applied to the operation of vehicles having windows which were treated "after-market."

**8.** The Joint Appendix reflected no evidence regarding the precise degree to which the minivan's windows were smoked. Instead, Moreno has in essence asserted, without evidentiary support, that it should have been visually manifest to the police officer that the vehicle's windows were not so blackened as to transmit less than 35% of ambient natural luminescence.

However, during trial court proceedings, Detective Valentine testified that, as a Memphis police officer, he primarily enforces Memphis city ordinances; and that most Tennessee criminal statutes are identically replicated via parallel Memphis municipal ordinances. Furthermore, he repeatedly testified he had believed that the Tennessee "window tint" law was substantively uniform with the parallel Memphis ordinance. The city regulation at issue pronounces:

It shall be unlawful for any person to operate a motor vehicle upon a public highway, street or road, which has been altered, treated or replaced by the affixation, application or installation of any material which:

(1) Reduces the light transmittance in both front windows below eighteen (18) percent; or

(2) Causes the reflectance of any window to be more than thirty-five (35) percent.

Memphis City Code § 21–338(c).

Accordingly, *unlike* the previously-quoted Tennessee statute, which governs *only* vehicles registered by that state, the implicated city ordinance applies to *all* vehicles moving on public thoroughfares within the Memphis municipal borders. Furthermore, whereas the state regulation forbids the *"transmittance"* of less than 35% of visible light by vehicle windows, the municipal ordinance prohibits the *"reflectance"* of more than 35% of ambient light by vehicular windows (or, in other words, the *transmittance* of 65% or less of visible light into the passenger compartment). Thus, the reach of the Memphis ordinance is significantly broader than that of the state statute, in that it (1) embraces vehicles having comparatively lightly-tinted windows (2) irrespective of their state of registration.

Therefore, considering the undisputed proof that the defendant's van's side windows were tinted to *some* optically discernable degree, which Officer Valentine had adjudged to appear violative of a controlling legal standard, he had, at minimum, a "reasonable suspicion" that Moreno's vehicle may have violated the relatively far-reaching *Memphis ordinance* when he stopped that automobile for further investigation.[9] Even assuming, without deciding, that, as argued by the defendant, (1) the Memphis ordinance should be construed to banish from that city's roadways only vehicles having "after-market" window tinting, and (2) the subject vehicle's windows lacked "after-market" stickers, Detective Valentine was nonetheless justified in pursuing an *investigation* of a possible transgression of the Memphis window tint ordinance, because, for any of numerous possible reasons or causes, "after-market" window decals may have been subsequently removed, or never initially attached, following post-manufacture tinting.

At bottom, any confusion on Valentine's part about the origin of the law which he was enforcing—that is, whether it was a state statute or a municipal ordinance—is, in the final analysis, immaterial. The ultimate dispositive uncontroverted fact is that he correctly concluded that an extant regulation which he was sworn to enforce within the Memphis municipal limits may have illegalized the movement of the subject minivan on the public byways because of its side window tinting, thus warranting his further investigation to ascertain whether that vehicle's windows complied

---

9. The defendant has not gainsaid the government's contention that the degree of darkening on the minivan's side windows violated, or at minimum visually appeared to violate, the Memphis ordinance.

with or impinged that stricture. Hence, the predicate vehicular stop, and Valentine's initial verbal interactions with the occupants of the minivan, for that purpose, were "reasonable" under the Fourth Amendment. *See Terry,* 392 U.S. at 19. Immediately thereafter, as developed above, the officer perceived plainly evident indicators of possible narcotics trafficking, which legitimated his priority shift from an investigation of a suspected window tint violation to an inquiry into the potential unlawful presence of controlled substances within that vehicle.[10] *See United States v. Hill,* 195 F.3d 258, 264 (6th Cir.1999), *cert. denied,* 528 U.S. 1176, 120 S.Ct. 1207, 145 L.Ed.2d 1110 (2000).

Accordingly, Officer Valentine's stop of the subject motorcar was authorized by his "reasonable suspicion" that its side windows may have violated the Memphis tint ordinance. Consequently, the defendant's postulate that the predicate vehicular stop constituted an "unreasonable seizure" under the Fourth Amendment, which vitiated the subsequent consent search of that vehicle, was misconceived.

■ Additionally, Moreno has contended that the Memphis "window tint" ordinance violated the United States Constitution, for two reasons. Primarily, he has alleged that the Memphis enactment contravened Congress' sole plenary power to regulate interstate commerce. *See Dennis v. Higgins,* 498 U.S. 439, 446, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991). Secondarily, the defendant has posited that the ordinance averredly erected an unreasonable local impediment to the movement of persons between and among the several states. *See United States v. Guest,* 383 U.S. 745, 758–59, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966). Both constitutional arguments were rooted in the peculiar equipment requirements imposed by the ordinance upon passenger vehicles traveling interstate while they are temporarily transient within the jurisdiction of Memphis, Tennessee. Alternatively, Moreno has assailed the subject Memphis ordinance as allegedly void by reason of its incongruence with the more narrowly circumscribed Tennessee "window tint" statute. *See Southern Railway Co. v. City of Knoxville,* 223 Tenn. 90, 442 S.W.2d 619, 621 (Tenn.1968); *Bernard v. Sharp,* 481 S.W.2d 782, 783 (Tenn.Ct. App.1972). The defendant has hypothesized that, if the Memphis ordinance is repugnant to either the federal Constitution or Tennessee statutory law, Detective Valentine's stop of the minivan to enforce, or to investigate a possible transgression of, that null ordinance, should be judicially deemed unjustified.

That ill-formulated argument must be rejected. The peace officer had no objective reason to question the vitality of Memphis City Code § 21–338(c). Facially, that ordinance was a commonplace automotive equipment safety regulation of the kind

---

**10.** Therefore, the defendant's protests (1) that Valentine did not test the darkness of the windows with his state-issued "comparison card" until *after* he had searched the vehicle and arrested its occupants; (2) that the officer may have erroneously concluded that the van windows were tinted to a degree disallowed under *state* law; (3) that the patrolman's Tennessee "comparison card" may have been inaccurate and misleading; and (4) that neither occupant of the automobile was subsequently charged with any "window tint" infraction, were each immaterial to the action *sub judice.*

Because, for the reasons evolved herein, Valentine's *initial stop* of the vehicle, and his affiliated brief questioning of its occupants, were lawful, and because *events immediately subsequent* to the permissible stop supplied the officer with sufficient reasonable suspicion to shift the object of his investigation to the suspected carriage of illegal contraband, the existence or nonexistence of an *actual* "window tint" violation under either state or municipal law was ultimately *irrelevant* to the prosecution in controversy.

which fits neatly into the traditional "police power" of state and local governments to regulate the health, safety, welfare, and morals of the community. *See, e.g., Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 134 (6th Cir.1994). A constable of the peace, unschooled in the jurisprudence of constitutional federalism and state law pre-emption, is entitled to presume that a duly adopted city ordinance which he was sworn to enforce comports with the American Constitution and superior state law, absent facial invalidity or a contrary controlling judicial decree. *See, e.g., Aronson v. City of Akron*, 116 F.3d 804, 809 (6th Cir.1997) ("Legislative enactments carry a strong presumption of constitutionality.") (citation omitted); *Painter v. Robertson*, 185 F.3d 557, 571 n. 21 (6th Cir.1999) (explaining that judges and prosecutors, not policemen, are equipped to address complex questions of law).

Therefore, because Officer Valentine's invocation° of the Memphis ordinance as authorization for the subject traffic stop was "objectively reasonable," that stop is unassailable *even if* the ordinance is judicially voidable by reason of conflict with the federal Constitution or the law of Tennessee. *See Illinois v. Krull*, 480 U.S. 340, 349–50, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (remarking, *inter alia*, that "[u]nless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law."). Consequently, because the ultimate validity or invalidity of Memphis City Code § 21–338(c) is not material to the cause *instanter*, this reviewing court has no occasion to resolve that question.

This reviewing court has carefully considered the trial court record, the controlling law, and the briefs and arguments of counsel, and has concluded that the defendant's contentions were each ill-conceived. Accordingly, the faulted traffic stop was justified as incident to Officer Valentine's good faith enforcement of Memphis City Code § 21–338(c), and thus did not transgress the Fourth Amendment. Hence, the lower court correctly rejected Moreno's petition to suppress evidence discovered inside the minivan following that stop. Moreno's judgment of conviction and sentence is **AFFIRMED**.